**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2280-24

SABIA CONSTRUCTION, LLC,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

PALISADES FIRE HOUSE, LLC
and JOSEPH GIANFORTE,

      Defendants-Respondents/
      Cross-Appellants.

_____

> Submitted April 28, 2026 – Decided July 24, 2026
>
> Before Judges Susswein and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3181-22.
>
> Dana Wefer, attorney for appellant/cross-respondent.
>
> Castano Quigley Cherami, LLC, attorneys for respondents/cross-appellants (Gregory J. Castano Jr. and Schuyler Abbott, on the briefs).

PER CURIAM

This appeal arises from a dispute concerning the renovation of an old firehouse and construction of a twenty-unit residential building in Jersey City. Plaintiff Sabia Construction, LLC brought a breach of contract action against defendants Palisades Fire House, LLC (PFH) and Joseph Gianforte for non-payment of $419,013.40 in "change orders" that exceeded the original construction contract bid of $7,800,000. Following a bench trial, the trial court found that the parties had settled the change order claims and based on that finding, dismissed all claims and counterclaims. After reviewing the record in light of the governing legal principles, we affirm. We also affirm the trial court's denial of defendants' motion for counsel fees.

I.

We discern the following facts and procedural history from the record.

A. The Project

Plaintiff is a general contracting company, owned and operated by brothers Anthony Sabia (Anthony) and Joseph Sabia (Joseph).[1] PFH owns commercial property in Jersey City that contained an abandoned firehouse. Arthur Pronti is a principal of PFH and Pronti Construction Company (a non-

---

[1] Because the Sabia brothers share a common surname, we refer to them by their first names. We mean no disrespect in doing so.

party to this case). Gianforte is an employee of PFH, engaged as its project manager.

On August 19, 2019, PFH engaged plaintiff to renovate the abandoned firehouse and build a twenty-unit residential building and adjoined commercial gym on its Jersey City property. Plaintiff and PFH executed a standard industry contract, form AIA101-2007, which incorporated the project specifications in attachment A and the form's standard terms and conditions. The contract was signed by Anthony and Pronti. Pursuant to the contract, plaintiff was to provide labor, services, and materials to PFH in exchange for compensation totaling $7,800,000.

Construction began in or around August 2019 but encountered some delays attributable to the COVID-19 pandemic and other unforeseen construction obstacles, such as difficult blue stone removal at the start of demolition. Construction was completed and the final city inspections were passed in or around May 2022. A certificate of occupancy was issued on June 7, 2022. The parties have no dispute regarding the quality of construction or the work performed.

## B. The Contract Terms

Under the contract, Anthony was designated as plaintiff's representative and Gianforte was designated as PFH's representative. Lee Levine was designated as the architect but was later replaced by Dirk Garlick sometime around March 2021, when Levine resigned for "personal reasons." Gianforte estimated that Garlick replaced Levine when the project was approximately thirty percent complete.

Under section 4.2 of the contract, the architect was charged with the responsibility of "Administration of the Contract," which included making site visits (§ 4.2.2), issuing certificates for payment due to plaintiff as the contractor (§ 4.2.5), preparing change orders (§ 4.2.8), determining the dates of substantial completion and final completion (§ 4.2.9), and issuing the final certificate of payment (§ 4.2.9).

Section 9.3 of the contract provided for incremental progress payments to be made throughout construction, which were triggered when an application for payment was made by plaintiff. The contract provided in pertinent part:

> At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment prepared in accordance with the schedule of values, if required under Section 9.2, for completed portions of the Work. Such application shall be notarized, if

4

required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and shall reflect retainage if provided for in the Contract Documents.

Under section 9.4 of the contract, that "Application for Payment" would then be certified as "properly due" by the architect by signing the Certificate for Payment.

Anthony testified that initially, Levine was making site visits approximately every one to two weeks and performed site inspections. But when Garlick replaced Levine, the pattern changed. Garlick never came to the site and was never involved with changes to the project. Anthony testified that the parties "change[d] the way the project was functioning" and that "once [Levine] was removed from the job, [Gianforte and Pronti] told [Anthony] just to send [payment requisitions] to them directly. That they didn't need the architect's signature." Once Levine left, the requests for payment were never signed by the architect.

In addition, the contract permitted changes to the agreed upon work through a "change order," subject to agreement by the owner, contractor and architect, unless it was a "minor change," in which case only the approval of the

architect was required. A "change order" is defined in section 7.2.1 of the contract as

> a written instrument prepared by the Architect and signed by the Owner, Contractor, and Architect stating their agreement upon all of the following:
>
> 1. The change in the Work;
>
> 2. The amount of the adjustment, if any, in the Contract Sum; and
>
> 3. The extent of the adjustment, if any, in the Contract Time.

Anthony testified that he prepared change orders throughout construction and sent them to defendants via email. However, these orders either went "unanswered" or Anthony was told "[Pronti's] reviewing it" or "[w]e'll sit down, and we'll work it out." As with the payment requisitions, Garlick also never signed the change orders. Anthony had no interactions with Garlick until the final certificate of occupancy was issued.

The court reluctantly allowed Amin Terouhid to testify as an expert on behalf of plaintiff in order to demonstrate for the court "if the contract had been administered [by the architect], basically what the architect would have done." The court cautioned that Terouhid's testimony was permitted only to the extent it aided the trier of fact, not to interpret the contract terms as a matter of law,

A-2280-24

and that it was further limited by the court's credibility and probative value findings.

Terouhid opined as to the importance of the role of the architect:

> So typically, the architect has the role of fair[] and impartial review of change orders, among other duties. So they're supposed to receive the change order requests and evaluate if that is really a change. In other words, is that an additional work or modifies the scope of work as stipulated in the contract? And then if that's a change, they would specify if it has a cost impact, it has a time impact, or any impact on other aspects of the project. And then once they approve that, as the independent reviewer, they can then bring that to the attention of the owner, and the owner formally issues the change order. And after that, that becomes part of the contract.

Terouhid also testified as to reasonableness of each change order value, opining that each change order at issue here would have been approved by the architect. However, "[t]he [c]ourt did not find the testimony of plaintiff's witness Dr. Terhouid [sic] to be persuasive. He failed to explain how and why the purported change orders should supersede the terms of the written contract."

### C. Contract Payments

By May 5, 2022, plaintiff had submitted twenty-five "applications for payment" (or payment requisitions) throughout construction, totaling $7,553,957, all of which were paid in full. However, the testimony and the

documentary evidence reflects that the signature requirements for payment requisitions per the contract terms were largely ignored. For example, application for payment #9 and application for payment #10 present the only payment requisitions that were signed by an architect, and arguably application for payment #13 was also signed by an architect but the signature is illegible.

Anthony testified that early on during the project, Levine would sign all applications for payment. He indicated that sometime around the third application for payment, Levine had his "own battles" with defendants and so he stopped signing the applications. Anthony claimed that Pronti advised Anthony that they did not need the architect's signature anymore going forward. There was no testimony suggesting that plaintiff objected to this new instruction or course of dealing.

Separate and apart from those applications for payment, plaintiff had also submitted numerous change orders beginning in February 5, 2020, through March 16, 2022, representing work performed outside of the contract or otherwise excluded from the scope of work indicated on attachment A of the contract. Anthony explained his understanding of the difference between an invoice and a change order: "So an invoice is for work completed. A change

8

order is for work that we completed that we're requesting payment." Both are for "work completed outside the scope of the proposal."

The testimony also revealed that the signature requirements per the contract terms for the change orders were universally ignored. Joseph testified that Pronti reassured him that payment for those change orders would be addressed "in the end." Gianforte agreed, testifying that if plaintiff did not add a change order value to a payment requisition, it was not otherwise paid, and that "we said that we would repay them all at the end. Keep going and we'll pay them at the end."

On cross-examination, Joseph acknowledged that in the first seven applications for payments through August 2020, "zero" dollars were added in change orders. The application for payment #8 dated September 14, 2020, reflects a $40,000 change order payment demand, which was carried on the balance of the applications for payment because it remained unpaid. To reflect this addition, the "contract sum to date" was revised to indicate a new value, $7,840,000, which was also carried through to application for payment #25.

Anthony testified that on June 8, 2022, he created a "payment summary" for the project and sent it to defendants, which indicated the original contract amount of $7,800,000, the total of payments received as of that date to be

9

$7,553,957, a credit of $53,604 for payment made directly by Pronti to Kennedy Tile, and a remaining balance due under the original contract totaling $192,439.[2] Below that balance, Anthony explained that he included an inventory of all invoices and change orders which remained open, which totaled $650,513. It then showed a payment of $40,000 received by plaintiff, and revised the balance due to plaintiff as of June 8, 2022, to be $610,513.48.

This accounting is more clearly illustrated in the application for payment #26 dated June 20, 2022. That application included $67,439 due to plaintiff under the original contract price, new "change orders" totaling an additional $610,513.48, and $40,000 in holdover charges from previous months. The "current payment due" under application for payment #26 totaled $677,952.48.

On June 9, 2022, plaintiff sent PFH a letter titled "Final Payment Affidavit" stating "[t]his serves as confirmation all material suppliers, vendors, and subcontractors have been paid in full based on final payment due in [s]ummary dated June 8, 2022." Gianforte explained that this representation is important because they need "something" to prove that all vendors and subcontractors have been paid to ensure that none of those vendors will place a lien on the property.

---

[2] This document was not included in the record on appeal.

On July 6, 2022, Joseph, Gianforte, and Pronti met to discuss/negotiate the final payment demanded by plaintiff. At that meeting, plaintiff's June 9 letter was modified, and then signed and dated by Joseph and Pronti. With the addition of two sentences at the end, the modified June 9 letter provided:

> This letter serves as confirmation that all material suppliers, vendors, and subcontractors have been paid in full based on final payment due in Summary dated June 8, 2022. <u>Pronti Construction is paid in full on their obligations at 520 Palisades Avenue. Arthur Pronti cannot be held liable for any additional monies.</u>

[(Emphasis added).]

The next day, July 7, PFH paid plaintiff $247,439. Also on July 7, plaintiff submitted to PFH an application for payment #27, where a $240,000 past payment is indicated and the "current payment due" was reduced to $20,000. On August 23, defendants paid PFH the "held back" $20,000 from the original contract sum.

To reconcile these numbers, Gianforte testified that the parties agreed to a $200,000 "settlement" payment for all outstanding change orders. Conversely, Anthony testified that "any payment that [defendants] gave [Joseph] that day was going towards the balance of $610,513" in change orders. However, Joseph admitted that he signed the letter because the company was desperate: "It was something that I was pushed into that I had to sign. We were desperate for the

money at the time." He testified that the "conversation entail[ed] settlement of all claims," although Joseph explained to Pronti that "this wasn't enough money" for them.

The following month, plaintiff instituted this lawsuit demanding the unpaid balance of the change orders, which totaled "$419,013.40 for work, services and materials it provided to complete the [p]roject to PFH's requirements." Defendants responded that the July 7 payments were accepted in full satisfaction of the disputed debt as evidenced by the "settlement" letter.

On September 23, 2022, plaintiff filed a complaint against defendants alleging unjust enrichment (count one), breach of contract (count two), breach of the covenant of good faith and fair dealing (count three), fraud (count four), and conspiracy to commit a tort (count five). Defendants filed three motions to dismiss, each of which were denied by the court for procedural reasons on December 16, 2022, January 3, 2023, and March 17, 2023. On March 27, 2023, defendants filed an answer and counterclaims alleging fraud in the inducement (count one) and frivolous litigation (count two).

On or about June 15, 2023, the parties entered a consent order allowing plaintiff to file an amended complaint out of time, which was authorized by the court. On June 27, plaintiff filed an answer to defendants' counterclaims. On

12

June 29, plaintiff filed an amended complaint to add a claim asserting a violation of the Prompt Payment Act (PPA), N.J.S.A. 2A:30A-1 and -2. On July 5, defendants filed an amended answer.

On January 5, 2024, the court entered an order granting defendants' motion to amend its counterclaims. On January 11, defendants filed an amended counterclaim, adding claims for negligence (count three) and breach of contract (count four). On January 31, plaintiff filed an answer to defendants' amended counterclaims.

On September 3, 2024, the court denied defendant Gianforte's motion for summary judgment. On September 10, plaintiff filed an offer of judgment for $2,500,000.

The court presided over an eight-day bench trial from September 25, 2024, through October 20, 2024. On January 24, 2025, the court delivered its oral decision, first denying defendants' motion to amend their counterclaim to add a count alleging violations of the Consumer Fraud Act, and ultimately found no cause of action could be sustained by plaintiff on any count or by defendants on their counterclaims.

On January 29, 2025, plaintiff filed a motion for reconsideration and defendants moved for counsel fees under the PPA. On February 27, the court

denied plaintiff's motion for reconsideration, finding that it did not meet its burden of demonstrating that the court "overlooked controlling case law or committed clear error under Rule 4:49-2 such that the [c]ourt's verdict should be reversed or otherwise modified." On the same day, the court denied defendants' fee application, explaining that "[d]efendants are not [the] 'prevailing party' under either statutory or caselaw for the purposes of successfully asserting a claim for counsel fees under the [PPA]."

The court entered a final judgment on April 17, 2025. Plaintiff filed its amended notice of appeal on April 23 (challenging the April 17, 2025, order dismissing all claims). Defendants filed a cross-appeal on April 15, (challenging the February 27, 2025, order denying counsel fees under the PPA).

The parties raise the following issues for our consideration. Plaintiff contends that the trial court erred: (1) in finding that a settlement agreement existed between the parties; (2) in finding that plaintiff, by adapting to defendants' failure to maintain an architect in accordance with the contract terms, breached the contract; (3) in dismissing plaintiff's breach of the implied covenant of good faith and fair dealing claim; (4) in dismissing plaintiff's unjust enrichment claim; (5) in dismissing the PPA claims; and (6) in dismissing plaintiff's fraud claims.

A-2280-24

Defendants argue on cross-appeal that the trial court erred in denying their application for attorneys' fees and costs.

## II.

We first address plaintiff's contention that the trial court incorrectly found that the June 9 letter reflected a settlement agreement between the parties and enforced it as such. Additionally, plaintiff claims that the court erroneously denied its motion for reconsideration because "the court did not state what evidence it found credible and the only evidence offered by PFH to support its claims are documents and information external to [the June 9 letter], the consideration of which violated the parol evidence rule if used to fill in absent information." Its claims are expressed through two arguments: first, that the June 9 letter is not a settlement agreement, and second, that the record does not support the finding of an accord and satisfaction.

Defendants respond that the evidence revealed that "the parties settled the $600,000+ change order issue for $200,000" and further, the evidence supports the finding of an accord and satisfaction.

## A.

Regarding the settlement of claims, although the court found "the final payment affidavit of July 2022 executed by the parties" to be "an imperfect

15

agreement," it nonetheless found the affidavit "to be credible and a reasonable reflection of the parties' intent to resolve all the outstanding claims in this case." The court was "satisfied that Gianforte sincerely believed that the July 6th, 2022 final payment affidavit and the attended meeting at which it was executed constituted a legitimate imperfect agreement to resolve any dispute for claimed unpaid work and materials to which all parties consent." The court further noted that "[d]efendants paid the entirety of the contract price and they even paid the extra $240,000 to resolve the alleged claims of [plaintiff]."

The court also found no credible evidence in the record that plaintiff "was forced, threatened, or coerced to perform work outside the contract." The court found that plaintiff reviewed and bid on the contract before executing it, and "had recourse as relating to the escalating costs of supplies and the COVID port stoppages in 2020 by following the change order procedure in 7.2.1." In addition, the court found that any alleged verbal agreement between the parties was superseded by the plain language of the contract.

In denying the motion for reconsideration, the court bolstered its prior holding, explaining that it "reviewed credible evidence that the outstanding claims had been settled by way of the letter agreement, which albeit an imperfect settlement, did have bargained for consideration, an offer, and acceptance."

16

The standard of review for judicial fact finding during a bench trial is well-established and deferential. Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 336 (App. Div. 2021). Ordinarily, "[t]he scope of [our] review of a trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). Factual findings are "binding on appeal when supported by adequate, substantial, and credible evidence," and thus this court should not disturb those factual findings unless they are "'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Township of North Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). Deference is particularly appropriate when the evidence is largely testimonial and involves questions of credibility, as the trial judge observes the demeanor and conduct of witnesses firsthand. City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018). However, this court reviews legal determinations de novo, giving no deference to the trial court's interpretation of the law or the legal consequences flowing from established facts. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)

(citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

So too our review of a motion for reconsideration is deferential. Hoover v. Wetzler, 472 N.J. Super. 230, 235 (App. Div. 2022) (citing Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021)). "Motions for reconsideration are governed by Rule 4:49-2, which provides that the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." Ibid. (quoting Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015)).

In New Jersey, settlement agreements are contracts, governed by general principles of contract law. Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (citing Pascarella v. Bruck, 190 N.J. Super. 118, 124 (App. Div. 1983)). Because settlement of litigation "ranks high in our public policy," "our courts have refused to vacate final settlements absent compelling circumstances." Ibid. (internal quotation marks and citation omitted). "In general, settlement agreements will be honored 'absent a demonstration of fraud or other compelling circumstances,'" ibid. (quoting Pascarella, 190 N.J. Super. at 125), and will be vacated only upon a demonstration of clear and convincing evidence, ibid. (citing DeCaro v. DeCaro, 13 N.J. 36 (1953)). To wit, "[i]f a settlement

agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside." Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008) (quoting Peskin v. Peskin, 271 N.J. Super. 261, 276 (App. Div. 1994)).

For a settlement agreement to exist, the parties must mutually agree to all material terms, and the agreement must be enforceable as a contract. Ibid. "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992). "Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable." Ibid. "The addition of terms to effectuate the settlement that do not alter the basic agreement will not operate to avoid enforcement of an agreement to settle a litigated matter." Willingboro Mall, Ltd. v. 240/242 Franklin Ave., LLC, 421 N.J. Super. 445, 453 (App. Div. 2011). Generally, settlement agreements do not have to be in writing to be enforceable if the evidence demonstrates that the parties have agreed to the essential terms. See Pascarella, 190 N.J. Super. at 124 ("That the agreement to settle was orally made is of no consequence, and the failure to do no more than, as here, inform the

court of settlement and have the clerk mark the case settled has no effect on the validity of a compromise disposition.").

Plaintiff makes multiple arguments in support of its overarching claim that no settlement was reached. First, plaintiff argues that "[t]here was no evidence that either [defendants] or [plaintiff] made an offer for [plaintiff] to accept $200,000 in full satisfaction of the unpaid invoices." Plaintiff claims that the language of the June 9 letter does not reflect a settlement as there is "no promise to release or waive legal claims."

In rejecting those arguments, the trial court relied upon the contents of the June 9 letter, the bench trial testimony regarding the July settlement meeting, and actions taken after the July meeting. We note the parties agree that they met on July 6 to discuss the final payment and change order demands, and that additional language was added to the June 9 letter indicating that defendants "paid in full on their obligations at 520 Palisades Avenue" and "cannot be held liable for any additional monies." Anthony confirmed that the language was added. This language alone suggests finality.

The testimony further reveals the parties' intent when drafting that language. Although Anthony was not present at this meeting, he testified that he did not believe the letter to be a settlement of claims, but rather that the

20

$200,000 was simply a payment made towards the balance of $610,513.  Joseph was at the meeting, along with Pronti and Gianforte.  Joseph testified that he signed the letter because the company was desperate for the money and acknowledged that their conversation included some discussion surrounding settlement of all claims but that $200,000 was not enough money.  Yet, he accepted the money and signed the June 9 letter with the additional "settlement" language.  He made an election.

Importantly for purposes of this appeal, the trial court found plaintiff's witnesses to be credible, stating:  "Overall the [c]ourt found their testimony to be credible as to their sincere beliefs concerning the scope of the contract and what was required in the Palisades Fire House project."  In contrast, the court questioned Joseph's credibility when he failed to recall whether he was present for the changes made to the June 9 letter but ultimately found that he did not necessarily intend to deceive the court, noting that it may have been just a clerical task.  The court also "somewhat" questioned Anthony's credibility as to his inability to remember if his own company was ever sued.

Gianforte testified on behalf of defendants that at the July meeting, the parties negotiated each change order:  "[t]hey started out, again, at $650,000; we negotiated them all.  We came to an agreement of $200,000.  We settled it."

21

He explained, "The agreement was that . . . we settled all the change orders for $200,000. We don't owe them any more money on the project. The project is paid in full. We . . . wrote it up, and . . . Mr. Sabia and Mr. Pronti signed it in our office."

The trial court found Gianforte to be "a somewhat credible witness" due to his confusing testimony regarding his understanding of the change order process under the contract. However, the court was "satisfied that Gianforte sincerely believed that the July 6th, 2022 final payment affidavit and the attended meeting at which it was executed constituted a legitimate imperfect agreement to resolve any dispute for claimed unpaid work and materials to which all parties consent."

Consistent with that interpretation and expression of intent, the next day, PFH paid plaintiff $247,439. Also, that same day, plaintiff submitted to PFH application for payment #27, which reflected a received payment of $240,000 and indicated the new balance due of $20,000. There is no indication on this post-meeting application for payment of the $419,013.40 now claimed by plaintiff to be outstanding.

On this record, we conclude that the trial court's decision finding an offer and acceptance of settlement was adequately supported by both testimony and the documentary evidence.

B.

We next consider plaintiff's argument that the purported settlement agreement lacks evidence of consideration. Plaintiff contends "[t]here is no promise of future performance by anyone in the letter. [Plaintiff] had already delivered a completed building and paid the suppliers, vendors, and subcontractors." Defendants respond that plaintiff's position "essentially, and erroneously" suggests that "any settlement would have been legally impossible." Defendants explain that "[p]laintiff exchanged its right to pursue the purported $600,000+ of 'change orders' in litigation for $200,000; [d]efendants exchanged their right to challenge those same defective 'change orders' for the $200,000 payment." We find defendants' argument more persuasive.

"Consideration is 'a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation.'" Sipko v. Koger, Inc., 214 N.J. 364, 380 (2013) (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 87 (2002)). "[B]oth sides must 'get something' out of the exchange." Bernetich, Hatzell & Pascu, LLC v.

23

Med. Recs. Online, Inc., 445 N.J. Super. 173, 183 (App. Div. 2016) (quoting

Cont'l Bank of Pa. v. Barclay Riding Acad., 93 N.J. 153, 170 (1983)). In the

context of settlement agreements, the resolution of a disputed claim itself can

constitute sufficient consideration. Sears v. Langer Transp. Corp., 129 N.J.L.

490, 492 (1943) ("Where the dispute is bona fide, the payment of a sum less than

that claimed by the creditor is a consideration for the creditor's discharge of a

matured debt, and such constitutes an accord and satisfaction good in law."). In

Cedar Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J., 312 N.J. Super. 51,

(App. Div. 1998), we explained:

> Forbearance from suit is adequate consideration to support a settlement agreement and bind the proposed defendant by its terms. That is so even where one of the parties to the agreement is in financial difficulty, and the other party is seeking the best possible terms, i.e., "driving a hard bargain."
>
> [Id. at 63 (internal citation omitted).]

These principles originated from our Supreme Court, which explained:

> Where there is adequacy of consideration, there is generally no duress. . . . Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion. . . . Under

this rule, the party exerting pressure is scored only for that for which he alone is responsible.

[Cont'l Bank, 93 N.J. at 177 (quoting 13 Williston on Contracts § 1617, at 708 (3d ed. 1970)).]

Here, the trial court found that the settlement "resolve[d] any dispute for claimed unpaid work and materials to which all parties consent[ed]." (Emphasis added). It appears that plaintiff exchanged its right to recover the balance of its change order value for the immediate recovery of $200,000. Furthermore, defendants received a $410,000 discount in exchange for their right to challenge the amounts claimed in the change orders and to assert counterclaims for defective work. Gianforte testified that the purpose of the July meeting was to address defendants' challenges to the change order demands and the work performed, which in our view serves as sufficient consideration. Indeed, "forbearance from suit" is adequate consideration. Cedar Ridge, 312 N.J. at 63. In sum, we agree that the settlement contains adequate consideration.

C.

We likewise are unpersuaded by plaintiff's argument that any evidence supporting a finding of consideration violates the parol evidence rule. The parol evidence rule "is a rule of substantive law, not a rule of evidence" prohibiting the introduction of written or oral evidence that seeks to vary, contradict, or add

25

to terms of a written document intended to be a final integrated contract. Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268 (2006). New Jersey courts have taken an expansive view of what is considered admissible "relevant evidence" to determine the meaning of a contract:

> [e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.
>
> [Id. at 269 (alteration in original) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02 (1953)).]

To that end, our Supreme Court permits "broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties." Id. at 270. "It is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract." Ibid.

Here, the trial court relied on testimony to determine the intent of the parties when they added language to the June 9 letter and then signed it. In the same way, defendants introduced "application for payment #27" to demonstrate that plaintiff intended to reduce defendants' payment obligation to a final payment of $20,000 after receiving a $240,000 payment from defendants. Those conclusions do not contradict the language contained in the June 9 letter, but in fact support it. That letter indicates defendants have "paid in full on their obligations at 520 Palisades Avenue" and "cannot be held liable for any additional monies." Thus, the trial court properly used extrinsic evidence to interpret the June 9 "settlement" letter when it found that, "while an imperfect agreement," it was a "reasonable reflection of the parties' intent to resolve all the outstanding claims in this case."

27

D.

Plaintiff also asserts that there was no "accord and satisfaction" of the disputed "change order." We are unpersuaded by this argument for the same reasons we have already set forth above, since plaintiff's argument is essentially a repackaging of its contentions pertaining to the parties' intent.

We add that accord and satisfaction is an affirmative defense, not a cause of action. Cranmer v. Harleysville Ins. Co., 719 F. App'x 95, 98 (3d Cir. 2017); R. 4:5-4. Under New Jersey law, the affirmative defense of accord and satisfaction requires the defendant to prove: "(a) a bona fide dispute as to the amount owed; (b) a clear manifestation of intent by the debtor to the creditor that payment is in satisfaction of the disputed amount; and (c) acceptance of satisfaction by the creditor." Cranmer, 719 F. App'x at 98 (quoting Nevets C.M., Inc. v. Nissho Iwai Am. Corp., 726 F. Supp. 525, 536 (D.N.J. 1989), aff'd, 899 F.2d 1218 (3d. Cir. 1990)). Thus, demonstrating accord and satisfaction compels the same inquiries as evaluated above, namely investigation of the parties' intent. "[A]n accord and satisfaction, to be effective, necessitates a finding that the party making the tender and the party accepting the tender each intends the acceptance to serve as full satisfaction of the entire disputed

A-2280-24

obligation." Zeller v. Markson Rosenthal & Co., 299 N.J. Super. 461, 466 (App. Div. 1997).

In Zeller, we examined whether plaintiff's acceptance of a lesser amount of commissions she claimed she earned from the defendant constituted an accord and satisfaction in the absence of a statement by the defendant that her tender of the lesser amount was conditioned upon full satisfaction of the disputed claim. Id. at 465. We determined that the evidence revealed that the defendant did not make it clear that the plaintiff's acceptance of the payment was in full satisfaction of the debt, and the plaintiff's endorsements on the check did make it "perfectly obvious" that she was not accepting payment in full satisfaction of the debt. Id. at 465-66. There was no finding that each party intended the acceptance to serve as full satisfaction of the entire disputed obligation as required. Id. at 466.

The present situation is markedly different. Here, as discussed above, there is ample evidence that the parties intended to resolve their dispute over the change orders with the $200,000 payment. We therefore affirm the trial court's decision that the claims regarding the change orders were settled.

Because we agree with the trial court that a settlement was reached on the change orders, we need not reach plaintiff's contention that the trial court erred

29

in dismissing three of its contract claims alleging breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Nor do we need to reach plaintiff's contention that PFH violated the PPA when it failed to pay the change orders and invoices within twenty days after it was received.

## III.

We next turn our attention to plaintiff's contention that the trial court improperly dismissed its fraud claim because Gianforte and Pronti made affirmative statements and inferences that plaintiff should continue with construction and it would be paid "at the end." Defendants respond that "the record is devoid of any evidence related to fraud and [p]laintiff failed to cite any on appeal."

The trial court held that:

> There's no credibility evidence that [plaintiff] was forced, threatened, or coerced to perform work outside the contract. . . . [Plaintiff] had the opportunity to review and bid on . . . the proposed project before executing the contract.
>
> . . . .
>
> [Anthony and Joseph] testified that they were assured verbally that they would be, quote/unquote, taken care of, but these unsubstantiated claims do not supersede the plain language of the contract between the parties.
>
> . . . .

> Nor do the plaintiffs meet the clear and convincing standard required to make out the claims for fraud or conspiracy to commit a tort.

New Jersey appellate courts apply a deferential standard when reviewing a fraud claim dismissed after a bench trial. Allstate Ins. Co. v. Northfield Med. Ctr., PC, 228 N.J. 596, 619 (2017). "Reviewing appellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)).

To prove fraud, a plaintiff must demonstrate "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it;" and "(4) reasonable reliance." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citing Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624-25 (1981)). "[F]raud is never presumed, but must be established by clear and convincing evidence." Weil v. Express Container Corp., 360 N.J. Super. 599, 613 (App. Div. 2003) (citing Albright v. Burns, 206 N.J. Super. 625, 636 (App. Div. 1986)).

Plaintiff states no law and references only a single fact in support of its argument, namely, that Anthony and Joseph felt mislead by Gianforte and Pronti when they represented that plaintiff would be paid on the change orders after construction was complete. After hearing the witnesses, sifting through the evidence, and even restating this fact in its decision, the trial court remained unpersuaded. Plaintiff's argument omits a critical fact as well, namely, that the change orders were paid, just not in full. For these reasons, plaintiff has failed to identify a known false representation. In addition, plaintiff makes no attempt to state the elements of fraud, much less apply the facts to the four elements of fraud, further evidencing the weakness of this claim. In these circumstances, we conclude that the trial court's decision was not "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Allstate Ins. Co., 228 N.J. at 619.

IV.

Finally, we address defendants' cross-appeal. They argue that as the "prevailing party" below, they are entitled to recover counsel fees pursuant to the PPA because they successfully defeated plaintiff's claim. They further contend that the trial court improperly relied upon the interpretation of fee-shifting outcomes applicable in the context of the Law Against Discrimination

32

when it concluded that, as respondents, they are not entitled to recover counsel fees unless it is proven that the plaintiff's claim was brought in bad faith. They likewise assert that the trial court improperly compared recovery under the Consumer Fraud Act (Act) to that available under the PPA, arguing, without further analysis, that the fee-shifting provisions are "markedly distinguishable." Plaintiff responds that defendants' argument ignores the purpose and intent of the PPA, which is to ensure contractors are fully paid, and that to award a responding party counsel fees in defense of those claims would undermine the purpose of the statute.

Here, the trial court held that defendants were not entitled to recover counsel fees under the PPA because they were not a "prevailing party," reasoning:

> Defendants' motion requests that the [c]ourt flip the remedial purpose of the statute on its head and compel the moving party contractor to pay back counsel fees to the defendant non-moving party.
>
> The possibility of this remedy -- the probability would be that this remedy would completely thwart the remedial purpose of the [PPA] and would effectively deter and chill attorneys from taking nominal damages cases where the possibility existed of their having to pay counsel fees to the defendants should they lose at trial.
>
> . . . .

33

> Effectively the inducing qualities of fee shifting statutes would effectively be neutralized by allowing it to be a sword and a shield to a civil defendant.
>
> Similarly a small subcontractor who has not been paid for a large job and is therefore in dire financial straits as a result would be highly unlikely to pursue claims against the general contractor if there would be any substantial risk of their owing counsel fees should they not prevail at trial.

"'[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). However, while fee determinations are discretionary decisions made by trial courts, those determinations may be overturned when a clear error of law is present. JHC Indus. Servs., LLC v. Centurion Cos., 469 N.J. Super. 306, 312 (App. Div. 2021).

Under the PPA, the "prevailing party" is awarded reasonable costs and counsel fees: "In any civil action brought to collect payments pursuant to this section, the action shall be conducted inside of this State and the prevailing party shall be awarded reasonable costs and attorney fees." N.J.S.A. 2A:30A-2(f). The use of the phrase "shall be awarded" signals that the court has no discretion, and the award is automatic when a party prevails in litigation under the Act. See JHC, 469 N.J. Super. at 317 (describing it as "a mandatory fee award").

In JHC, 469 N.J. Super. at 309, we addressed the PPA's mandatory fee-shifting provision as it related to the trial court's imposition of a proportionality requirement of the fee award to the underlaying claim for damages. We ultimately reversed, finding that "[t]he law is well settled that '[a] reasonable attorney's fee may exceed the value of the recovery by the plaintiff' in a statutory fee-shifting case." Id. at 313 (second alteration in original) (quoting Balducci v. Cige, 240 N.J. 574, 599 (2020)). We also based our decision on legislative intent, explaining that the PPA's fee-shifting provision shares a common goal with all fee-shifting legislation:

> As our Supreme Court explained in Rendine, "our Legislature has passed a substantial number of statutes authorizing an award of a reasonable counsel fee to the attorney for the prevailing party." [141 N.J. at 322]. "Although the underlying purpose of those statutes may vary, they share a common rationale for incorporating a fee-shifting measure: to ensure that plaintiffs with bona fide claims are able to find lawyers to represent them[,] . . . to attract competent counsel in cases involving statutory rights, . . . and to ensure justice for all citizens." New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 185 N.J. 137, 152-53 (2005).
>
> [Id. at 312-13 (alteration in original).]

Relatedly, we relied on legislative history, noting the Senate Budget and Appropriations Committee's statement explained the remedial purpose for

A-2280-24

adding the PPA's attorney fee-shifting provision in 2006: "[t]he bill, as amended, provides procedures and remedies for prime contractors, subcontractors and subsubcontractors who are not paid in a timely way in connection with a public or private construction contract," including "that actions brought to collect payments pursuant to the bill be conducted inside of this State and that the prevailing party be awarded reasonable costs and attorney fees." Id. at 314 (alteration in original) (quoting S. Budget & Appropriations Comm. Statement to S. 1726 (June 30, 2006)). "As the entire thrust of the statute is to ensure that contractors and subcontractors receive full payment for their work promptly on completion, it is patently clear the Legislature intended the attorney's fee provision as 'one of the deterrent aspects of the legislation.'" Ibid. (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 24 (2004)).

Thus, we held in JHC that one of the PPA's principal goals was to encourage "stiffed contractors" to seek legal action to "vindicate their statutory rights." Id. at 315. "Without the court's unstinting enforcement of the statutory fee-shifting provision, contractors and subcontractors with relatively small claims would win only a Pyrrhic victory against defendants who failed to discharge their statutory obligations to pay promptly what they owe." Ibid.

In the matter before us, the trial court dismissed plaintiff's PPA claim, leading defendants to now assert that they are the prevailing party and entitled to recovery of counsel fees under the PPA. But as noted in JHC and aptly found by the trial court, defendants are simply not the intended recipients of the PPA fee-shifting protections. Interpreting the PPA as defendants suggest would contradict and undermine the PPA's clearly stated remedial purpose of encouraging contractors to seek full payment on their work performed and approved. As the PPA unambiguously provides, a party prevails when it "collect[s] payments pursuant to this section." N.J.S.A. 2A:30A-2(f). Defendants did not collect payments, but merely defeated plaintiff's claim.

To the extent we have not specifically addressed arguments raised by the parties in their respective appeal and cross-appeal, it is because those arguments are either rendered moot by our principal holding that the parties reached an enforceable settlement agreement, or else lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2280-24